Samuel L. Boyd, P.C.
Catherine C. Jobe
**BOYD & ASSOCIATES**
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile: (214) 363-6856
sboyd@boydfirm.com

Scott Volyn
WSBA No. 21829
**VOLYN LAW FIRM PLLC**
404 S Chelan Ave
Wenatchee, WA 98801-2912
Telephone: (509) 665-6727
Facsimile: (509) 665-0818
scott@volynlawfirm.com

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNDER SEAL | No. 13-CV- 333-JLQ |
| Plaintiffs | **FILED UNDER SEAL**<br>**DO NOT PUT IN PACER** |
| vs. | COMPLAINT OF RELATOR |
| | PURSUANT TO 31 U.S.C.<br>§§ 3729-3732, FEDERAL<br>FALSE CLAIMS ACT |
| UNDER SEAL | DEMAND FOR JURY TRIAL |
| Defendants | |

## COMPLAINT OF RELATOR
## <u>FILED UNDER SEAL</u>

RELATOR'S COMPLAINT          Page 1

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <br> Ex rel. Gregory P. Buhler, | ) ) ) | No. 13-CV-_____ |
| Plaintiff, | ) ) | **FILED UNDER SEAL** <br> **DO NOT PUT IN PACER** |
| vs. | ) ) ) | COMPLAINT OF RELATOR <br> GREGORY P. BUHLER |
| Confederated Tribes <br> of the Colville Reservation, | ) ) ) | PURSUANT TO 31 U.S.C. <br> §§ 3729-3732, FEDERAL |
| Defendant. | ) ) | FALSE CLAIMS ACT |
| | ) ) | DEMAND FOR JURY TRIAL |
| _____ | ) | |

## COMPLAINT OF RELATOR GREGORY P. BUHLER
## PURSUANT TO 31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT

The United States of America, by and through *qui tam* Relator Gregory P.

Buhler, brings this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act" or

"FCA") to recover all damages, penalties and other remedies established by the

False Claims Act on behalf of the United States and himself, and would show as

follows:

### PARTIES

1.    Relator Gregory P. Buhler is an individual citizen of the United

States, and resides in Wenatchee, Washington.

RELATOR'S COMPLAINT          Page 2

2.     The Confederated Tribes of the Colville Reservation is a sovereign nation, and the federally recognized American Indian "Tribe" that controls the Colville Indian Reservation in Washington. The nation is thus sometimes called the "Tribe" or the "Tribes." The Confederated Tribes consist of twelve individual tribes including the Arrow Lakes (Lakes, Sinixt), Chelan, Colville, Entiat, Nespelem, southern Okanagan, Methow, Moses-Columbia (Sinkiuse-Columbia), Nez Perce of Chief Joseph's Band, Palus, San Poil, and Wenatchee (Wenatchi). Approximately 9000 descendants from the original tribes are enrolled in the Confederated Tribes. The tribes are governed by the 14-person Colville Business Council, informally called the tribal council. Its current chairman is John Sirios. Four legislative Districts are represented on the Business Council. The Confederated Tribes' administrative office is located at the Bureau of Indian Affairs, 10 Nez Perce Street, Nespelem, WA 99155. The Confederated Tribes' Business Council can be contacted at P.O. Box 150, Nespelem, WA 99155-0150 or 1 Colville Street, Nespelem, WA 99155. The Confederated Tribes of the Colville Reservation are not immune from a suit brought by the United States.

## JURISDICTION AND VENUE

3.     Jurisdiction and venue are proper in this Court for the following reasons:

RELATOR'S COMPLAINT          Page 3

a.      Jurisdiction for this Court exists pursuant to 28 U.S.C. § 1331 and pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1) and 31 U.S.C. § 3732(a), because Relator's claims seek remedies on behalf of the United States for Defendant's multiple violations of 31 U.S.C. § 3729, all or some of which occurred in the Eastern District of Washington, and pursuant to 28 U.S.C. § 1345, as the United States is plaintiff.

b.      Venue exists in the United States District Court for the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) as defendant is a resident of the Eastern District of Washington or alternatively, (c)(3) if Defendant is not a resident of the United States, 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District of Washington, or 28 U.S.C. § 1391(f)(1)-(3) if Defendant is a "Foreign State" as defined by 28 U.S.C. § 1603(a).

## INTRODUCTION

4.      The purpose of this Complaint is to bring to light violations of the False Claims Act, 31 U.S.C. § 3729, including Medicaid fraud resulting from fraudulent conduct by Confederated Tribes of the Colville Reservation, Washington and their subcontractors at least as far back as mid-2008 and continuing at least until early 2012, when a major participant was indicted for the

RELATOR'S COMPLAINT          Page 4

fraud. The unlawful activities violating the False Claims Act included the proactive, purposeful actions of Defendant. These violations occurred as a direct result of Defendant's greed and disregard for legal consequences. A criminal case was filed against Debra Van Brunt-Oreiro on February 22, 2012, in the case styled *United States of America v. Debra Van Brunt-Oreiro dba ADJR Counseling Services*, No. CR-12-27-JLQ, In the United States District Court for the Eastern District of Washington as a direct result of disclosures made to the Government by Relator.

5.      This is a civil action to recover damages and civil penalties on behalf of the United States of America arising from false claims for payment submitted to the United States, the making and use of false statements and records including false certifications material to claims for payment, and conspiracy to submit false claims or make or use false statements or records material to false claims for payment. This *Qui Tam* Complaint, describes what is a years-long practice by the Confederated Tribes of the Colville Reservation, the Colville Department of Behavioral Health and its independent contracting social worker/mental health professionals to defraud the United States by submitting false or fraudulent claims for payment under the Medicaid program, making and using false statements or records material to false or fraudulent claims for payment under the Medicaid program, and conspiring to commit these acts. Debra Van Brunt-Oreiro dba ADJR

Counseling Services, LLC, a mental health counselor who contracted with the Confederated Tribes' Colville Department of Behavioral Health ("Behavioral Health"), in collaboration with the Confederated Tribes and Behavioral Health, devised a scheme pursuant to which the Confederated Tribes and Ms. Oreiro and her associates obtained hundreds of thousands of dollars from Medicaid for mental health services to children at the reservation, when such services were not provided. Records were falsified, with the knowledge of and by the Confederated Tribes, which submitted claims for payment by Medicaid. Instead of providing group mental health counseling services to the Tribes' children, Ms. Oreiro essentially ran a day-care center, in which the children received no mental health counseling. Records were falsified to indicate that every child attended every group session, that all of the children had the exact same diagnosis (which is almost always treatable by short-term counseling), and that all of the children were nonetheless treated for years without success and conclusion. In addition, claims were submitted for services not provided by Oreiro but by unqualified individuals and for services that were not medically necessary, all with the knowledge of the Confederated Tribes. Moreover, while Ms. Oreiro billed $85.00/per child encounter, the Confederated Tribes obtained $235.00 per child encounter from Medicaid. Although some information about this scheme has been publicly disclosed, Mr. Buhler is an—in this case *the*—original source of the information.

RELATOR'S COMPLAINT          Page 6

# BACKGROUND

6.    Relator Gregory P. Buhler is a 63-year-old Licensed Mental Health Counselor (LMHC) and a Designated Mental Health Professional (DMHP) with a Master of Arts degree in Psychology from Pepperdine University who has worked in the mental health field the past 15 years. He previously worked as an Orange County Reserve Police officer. Buhler became an employee of the Colville Confederated Tribes' Behavioral Health Department in May of 2008. Buhler had previously worked with Debra Oreiro, a contract mental health counselor for the Behavioral Health, at Okanagan County Mental Health, (1998 to 2002) where he had received a stellar work evaluation from her years earlier. At the Colville Behavioral Health Department, Buhler worked under the supervision of its director, Dorothy Hamner.

7.    Psychological and behavioral health problems are a considerable problem at the Colville Reservation. The suicide rate among the Tribes is staggeringly high—the highest in the U.S. among Native American tribes and about four times the national average. In fact, it is so high that a national team of specialists has visited the Colville Reservation to study the Tribes and their suicide rate. The homicide rate is also very high, as is the domestic abuse rate. Alcoholism and addiction problems are also extremely high. At the Colville Reservation, families are at significant risk for domestic violence, homicide/suicide, drug abuse,

and alcoholism. Because of the tremendously high unemployment rate (more than 50%), there is little to do on the Reservation to occupy the lives of the Native Americans. Consequently, people hang out at bars, come home drunk, and commit unbelievable acts of violence against their own families. Of course children suffer the most in this environment.

8.     Buhler was asked, in addition to his counseling duties, to help address the Tribes' gambling addiction problems.     Buhler developed a series of forums, seminars, and therapies to address these issues. He held a very successful first program, and submitted proposals regarding these programs he had developed as well as a particularly effective treatment program for addictions, including alcoholism, to the Department's director, Dorothy Hamner, but they were declined.

**THE COLVILLE DEPARTMENT OF BEHAVIORAL HEALTH**

9.     There were approximately seven therapists who worked for the Colville Tribes' Department of Behavioral Health during Relator's employment there. Five the counselors, including Relator, worked full time. The department provided services for all tribal members, regardless of ability to pay. The five counselors who worked with families and adults were able to see anyone and everyone who needed help. In addition, two therapists, Debra Oreiro and Marcy Palmer, worked full time as independent contractors, and exclusively with children reimbursable by Medicaid. No other counselor worked under that kind of contract.

Relator noticed early in his employment that the Tribal Council was constantly pressuring the Department to see larger numbers of patients. The average patient load carried by full-time therapists, (except Oreiro and Palmer), was about 50 patients per therapist per week. All of the charting, recording, paperwork, and documentation required for each patient made for 40-50 hour weeks for the full-time therapists. Nonetheless, Ms. Oreiro's team of two contract therapists regularly saw more patients in a week than the five full-time therapists saw in a month. The director of the department, Ms. Hamner often conveyed to the full-time therapists that the Tribal Council was pressuring the group to produce more patients. She checked their numbers weekly, almost like a sales manager. Furthermore, Ms. Hamner, the director, did not seem concerned about whether patients improved or not— just that there was a constant supply of patients for more treatment hours.

## MEDICAID

10.    The Confederated Tribes held medical provider contracts with the Washington State Medicaid Program ("Medicaid"), a public health care benefit program. Through this contractual arrangement, the Confederated Tribes submitted claims for reimbursement to Medicaid for services provided to eligible tribal members and their families under Medicaid Provider Number 1980812. In turn, the Centers for Medicare and Medicaid ("CMS"), an agency of the United States Department of Health and Human Services ("HHS"), reimbursed Medicaid, on

RELATOR'S COMPLAINT          Page 9

quarterly basis, for one hundred percent of the funds paid to the Confederated Tribes.

11.    The Washington State Medicaid Program under Title XIX of the Social Security Act and the Centers for Medicare and Medicaid "(CMS") are "health care benefit programs" pursuant to federal law.

12.    The Medicaid program was created in 1962 under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.,* whereby the United States shares with the fifty States the cost of medical services provided to indigent families with dependent children, and to aged, blind, and disabled individuals whose income and resources are insufficient to meet the cost of medical services.

## WASHINGTON MEDICAID MENTAL HEALTH AND INDIAN HEALTH SERVICES

13.    The Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ *450b et seq.,* P.L. 93-638, and regulations thereunder promulgated at 25 C.F.R. §§ 900.1 *et seq.,* provide basic federal funding for Native American Tribal health services in general. In Washington State, the American Indian Health Commission determined that Native American health care is a federal trust responsibility. As such the state provides no matching funds for American Indian/Native American Medicaid enrollees, and all of the funding for these services was derived from federal funds. The source of the federal dollars obtained by the conduct alleged herein is the CMS.

RELATOR'S COMPLAINT        Page 10

**TRIBAL INVOLVEMENT**

14. Relator's therapies are highly solution-based, and very effective, so his patients frequently improved, sometimes after only a few treatments. Relator's clients would often undergo major changes in their family life, mental health, and often could conclude treatment successfully. Relator soon realized, however, that this kind of success was not what the Tribal Council wanted.

15. Relator made his services available to anyone who needed his services, without regard to pay, including tribal law enforcement offices, tribal lockup facilities, and the courts, pursuant to what he understood was the Department's policy. But he was discouraged from providing services to non-paying clientele. Before he became aware of the fraudulent scheme, Relator made every effort to work with his employer to produce the numbers of paying client encounters expected. This was quite a stressful time for Relator, as his life-threatening kidney disease, diabetes and hypertension were progressing.

16. Relator knew the Tribes were receiving Medicaid reimbursement for all of their eligible clients. It was also clear that where patients remained under continuous treatment, the Tribes also obtained a continuous stream of income. Nonetheless, during his first year of work, Relator had no reason to believe that the Behavioral Health Department and the Confederated Tribes were dealing with Medicaid in anything but an upright, straightforward and legal manner.

RELATOR'S COMPLAINT          Page 11

17.    From previous years of mental health work, Relator was very familiar with Medicaid contract requirements for documentation and the "medical necessity" of treatment. He knew that Medicaid reimbursement requires many items. First, it requires a professional diagnosis indicating "medical necessity." Then a treatment plan must be provided, describing what course of treatment is indicated for the particular diagnosis. Furthermore, a copy of the therapist's disclosure statement must be provided to the patient. Medicaid also requires ongoing documentation, such as clinical notes from each session. It requires the therapist to document what he/she did for each patient according to the treatment plan, how successful it was, what the future treatment plans are, and it requires periodic reevaluation for continued treatment. Relator eventually learned that Oreiro and Palmer did not prepare or maintain any chart notes, clinical notes or treatment plans for any child. These chart notes are significant as they reflect the services rendered.

## RELATOR BEGAN TO SUSPECT ILLEGAL ACTIVITIES.

18.    Relator presumed that the other members of the staff were operating as he was in full conformity to the requirements of Medicaid, until one week in May of 2009 when he was asked to approve a voucher for Ms. Oreiro. Ms. Hamner was out of town, and Linda Payne, the head of the billing department asked Relator to approve a Purchase Order for Ms. Oreiro. Relator was so shocked by the

RELATOR'S COMPLAINT          Page 12

amounts contained in the Purchase Order, and thinking the Purchase Order must represent several months of work, he jokingly asked Ms. Payne, "Is this for the month?" "No," said Linda, "it was a week of reimbursement for Ms. Oreiro." One of the other office staff, Kathy Lezard commented, "Oh she [Ms. Oreiro] makes more in a month than I make in a year." Instantly, Relator's attention was captured by this as very unusual and potentially fraudulent activity. Since he had worked with Ms. Oreiro in previous years and knew that she was intelligent, orderly, and familiar with Medicaid requirements, he was even more concerned about these activities, as they could not have happened accidentally.

19.    Relator thus began to investigate the practices and billing contrivances of Colville's Behavioral Health department. First, Relator asked Linda Payne to forward copies of Ms. Oreiro and her associate, Marcy Palmer's invoices for the last year to his email.

20.    Relator examined those invoices and subsequently additional invoices and realized that Oreiro and Palmer's independent contractor services were making several hundred thousand dollars a year providing mental health services to the children of the Tribe. Interestingly, every child was covered by Medicaid. Also, Relator noticed that every child had come to every group, every time for years. The children's ages ranged from three to ten years. Relator also noticed that every therapy was done in a group. Each group lasted about sixty minutes. The groups

RELATOR'S COMPLAINT          Page 13

averaged between 20 and 30 children. Relator also noticed that no child was ever discharged. Relator further discerned that most of the children appeared to be misdiagnosed. Most were diagnosed with Adjustment Disorder, in which the child is having difficulty adjusting to his or her environment, and presents with maladapted behavior. In the DSM-IV, the manual for psychological disorders, it states that the diagnosis of Adjustment Disorder is only appropriate where the symptoms last for six months or less. It should not take more than six months to correct Adjustment Disorder because a change in nearly any variable can adjust the behavior, and thereby correct the disorder. Adjustment Disorder is the mildest disorder qualifying for professional psychological treatment, and it is a disorder that nearly any intervention can improve it. For instance, if a child is being abused, then the authorities can arrest the abuser, and in turn the disorder of the child changes. If a child is depressed because of his parents' divorce, the disorder changes (improves) with new family time, or other efforts to help the child cope. However, in Oreiro and Palmer's records, the same Adjustment Disorder of a child patient would be listed for multiple years.

21. Ms. Oreiro is also a licensed clinical social worker who would have known all of this about Adjustment Disorder. Ms. Oreiro knew the falsity of her diagnosis claims. Relator suspected that not only was she fraudulently creating contact hours, but also false medical diagnoses for these children, and even

RELATOR'S COMPLAINT          Page 14

creating false patients. She was taking advantage of these children and their parents, medically with records that would follow them for years. But the Tribes were very pleased about Ms. Oreiro and her associate's results. During his research Relator uncovered a Purchase Order for Ms. Oreiro's services for one year of $350,000. It appeared to be renewed every year.

22. Relator learned that the Council was almost entirely supportive of this activity, seeing it as a federal cash cow. It appears that only one Tribal Council member did not support this activity. Relator soon learned that for every dollar Ms. Oreiro billed Colville for her services, the Tribes made at least two times the amount. On information and belief, the Tribal Counsel knowingly submitted invoices for payment by Medicaid for at least two times the amount billed by Ms. Oreiro, knowingly submitted invoices for payment by Medicaid for services not provided at all and for services not reimbursable by Medicaid because not medically necessary and proper. On information and belief, Tribal Council member Cherie Moomaw was and is a close personal friend of Ms. Oreiro, and devised with Ms. Oreiro the fraudulent scheme described herein. On information and belief, at one or more Tribal Council meetings, including but not limited to a meeting held on December 22, 2008, Ms. Moomaw explained the plan to the Tribal Council, and the Council discussed the millions of dollars it could make by allowing the scheme to go forward. On information and belief, some members of

RELATOR'S COMPLAINT        Page 15

the council were intimidated into going along with the fraud, but nonetheless knowingly did participate in the scheme, allowed it to go forward, and made or caused to be made false claims, and made or used or caused to be made or used false records and or statements material to false claims for payment and conspired to do these things.

23.    Ms. Oreiro would "see" the patients and submit a bill to Colville Confederated Tribes. They would in turn use her information and bill Medicaid for reimbursement, ostensibly at 100%, but in reality at 200% or more. This turned out to be quite lucrative for the Tribes, as well as Ms. Oreiro. As Relator further investigated, he learned from various office personnel that this false claims activity had been going on for more than nine years at the time, in 2009; that is, on information and belief, the fraudulent billing activity had been going on since at least the year 2000. The false reimbursement for the contractors and the Tribes would amount to approximately $10 million in fraudulent billing paid by the U.S. Government.

## LOGISTICS OF THE SCHEME

24.    Pursuant to Defendant and Ms. Oreiro's scheme, medical services were billed to health care benefit programs, including at a minimum Medicaid, by using standard Current Procedural Terminology ("CPT") codes. CPT codes provide a uniform language that accurately describes medical, surgical, and diagnostic

RELATOR'S COMPLAINT          Page 16

services which are billed to government and private health insurance programs. The American Medical Association annually publishes a CPT Manual, which sets forth the criteria to be considered in selecting the proper codes to represent the services rendered.

25. When submitting a claim for reimbursement for services, medical providers were required to use CPT codes to identify each procedure and service. Providers were required to accurately list the CPT code that most completely identified the procedures or services performed.

26. Under State law and the Washington State Medicaid Plan, services provided through Indian Health Services ("IHS") and tribally-operated facilities were paid at the "encounter rate." DSHS covered up to one mental health encounter per client, per day. For purposes of the Tribal Health Program, DSHS defined a mental health encounter as "a medically necessary, face-to-face contact between a mental health provider and a client during which services are provided."

27. Medicaid set forth guidelines regarding payment for Indian Health Services, including that Medicaid would not pay for services that were not deemed to be medically necessary. Medically necessary services were defined in the Washington Administrative Code ("WAC") as a requested service which was:

> reasonably calculated to prevent; diagnose, correct, cure, alleviate or
> prevent the worsening of conditions in the client that endanger life or
> cause suffering or pain, or result in illness or infirmity, or threaten to
> cause or aggravate a handicap, or cause physical deformity or

RELATOR'S COMPLAINT      Page 17

malfunction. And further, that there is no other equally effective, more conservative or substantially less costly course of treatment available or suitable for the person requesting service. For the purpose of this section, "course of treatment" may include mere observation or, where appropriate, no treatment at all.

WAC 388-500-005. Additionally, Medicaid prohibited payment for subcontracted services provided by any individual who was not the licensed and contracted vendor.

28.     Claims were submitted to the Medicaid program by way of a Health Insurance Claim Form 1500 ("HCFA-1500") which was referred to as the Center for Medicare and Medicaid Services (CMS)-1500 Form and its electronic equivalent. Providers submitted a CMS-1500 and its electronic equivalent form to Medicaid to document their claims for reimbursement. The claim form required submission of certain information relating to the services provided, including: patient information; type of service identified by a CPT code; a modifier to further describe such service, if applicable; date that the service was provided; charge for such service; diagnosis; and the name and/or provider National Provider Identifier (NPI) number of the performing physician.

29.     Thus, beginning, on information and belief, as early as 2002, and continuing through on or about December 31,2010, Defendant and Oreiro ], individually, and doing business as ADJR Counseling Services, devised and implement their scheme to defraud the Washington State Medicaid Program and

RELATOR'S COMPLAINT          Page 18

CMS in order to obtain money in connection with payment for health care services, by means of materially false and fraudulent representations set forth in claims submitted for payment by Defendant's Tribal Health Program. Through this fraudulent scheme, Defendant's Tribal Health Program paid Oreiro dba ADJR Counseling Services approximately $358,955 (three hundred and fifty eight thousand nine hundred and fifty five dollars) for only the years 2006 through 2010, and on information and belief hundreds of thousands more, as payment for these materially false and fraudulent claims to Medicaid, and Defendant's Tribal Health Program received at least $1,060,118 (one million sixty thousand one hundred and eighteen dollars) for the same period and, on information and belief, hundreds of thousands if not millions more, from Medicaid for payment on these false or fraudulent claims.

30.    It was part of the scheme that from on or about January 1,2006, and on information and belief as early as 2002, continuing through at least December 31,2010, Oreiro, dba ADJR Counseling Services, knowingly obtained money from Defendant's Tribal Health Program, and Defendant in turn knowingly obtained money from Medicaid by: (a) submitting claims for reimbursement for mental health counseling services that were not actually provided; (b) submitting claims for reimbursement for mental health counseling services claimed to have been provided by Oreiro but which were instead provided by unqualified and

contractually prohibited individuals; and (c) submitting claims for reimbursement for mental health counseling services that were not medically necessary.

31.    Additionally, Oreiro, dba ADJR Counseling Services, knowingly falsely documented weekly billing invoices to Defendant that depicted charges for: (a) patient mental health counseling encounters which were not provided; (b) patient mental health counseling encounters claimed to have been provided by OREIRO but which were actually provided by unqualified and contractually prohibited individuals; and (c) patient mental health counseling encounters which were not medically necessary, and Defendant knowingly submitted false claims to the United States for payment based on these false records, which Defendant knew to be false.

32.    Furthermore, after receiving Oreiro's falsely documented weekly billing invoices, the Confederated Tribes' Behavioral Health Unit's billing department would transfer Oreiro's materially false and fraudulent invoices for mental health services to a CMS-1500 claim form and its electronic equivalent for submission to the Department of Social and Health Services, Health and Recovery Services Administration (HRSA) for Medicaid reimbursement.

33.    Oreiro, dba ADJR Counseling Services, with Defendant's knowledge and consent, would conduct large group sessions consisting, at varying times, of as many as 25 to 31 children, and submit claims for these sessions as if she had

RELATOR'S COMPLAINT          Page 20

conducted mental health encounters knowing full well that she provided no such service and that, even if she had, that such services were not medically necessary. Defendant and Oreiro knew that these sessions were not clinically directed at addressing patients' diagnoses and had little to no clinical value to any of the patients' actual diagnoses, and thus constituted a worthless products or services.

34. Additionally, Oreiro, dba ADJR Counseling Services, with the knowledge, consent, and encouragement of Defendant, kept children, many of whom were between four and six years of age, in what was purported to be, but was not, treatment, for several years with no change in their conditions, far in excess of accepted clinical standards.

35. Further, Oreiro, with the knowledge, consent, and encouragement of the Confederated Tribes, continued to purportedly "treat" patients who reported a general well-being and were not in need of mental health counseling and failed to properly treat individuals who were among vulnerable populations in order to maximize payments to Oreiro and the Confederated Tribes. As such, Oreiro and the Confederated Tribes chose not to treat children ineligible for Medicaid but nonetheless unable to pay for treatment, in violation of the Confederated Tribes' own standards and mission.

1
2
3
4
5
6
7
8
9
10
11

## RELATOR CONTACTED THE FBI.

36.    Relator first contacted the Tribal police Commander Marc Duncan who referred him to the FBI. Then on or about May 22, 2009, Relator contacted the FBI. Relator first met with FBI agents at his home in Wenatchee. Relator gave the FBI copies of the research he had uncovered. Later, Relator was contacted by Special Agent Lisa Jangaard, who leads the FBI team that investigates Medicaid fraud. Later, Relator met with Lisa Jangaard and Tim Durkin, who was an investigator for the United States Attorney General.

12

## RELATOR PROVIDED MATERIAL EVIDENCE.

13
14
15
16
17
18
19
20
21
22

37.    Relator gave the FBI and the Attorney General's investigator approximately 151 pages of vouchers and related billing documents from the Tribal billing office. These were invoices for services purportedly rendered by Ms. Oreiro's company, ADJR Counseling. These vouchers or invoices were Ms. Oreiro's method of billing the Tribes, and receiving payment. These invoices included purchase order numbers, dates of services, types of services rendered, hours, etc.

23
24
25
26
27
28

38.    At Relator's next meeting with the Government he brought Linda Payne of the Tribal billing office, who provided more evidence of the fraudulent billing activities. Relator provided lists of clients, names, dates, diagnosis, dates the children were seen, and how often they were seen. The counseling group's

RELATOR'S COMPLAINT          Page 22

information did not match the Tribal billing information to Medicaid. Additionally, the counseling group information indicated that every child actually attended every group for every session, which is highly unlikely. Sometimes these children were shown to attend three appointments a week or more. Moreover, no one ever got discharged, and all of Oreiro's clients were Medicaid recipients. Additionally, a major portion of the children were diagnosed with Adjustment Disorder, which is not used for a diagnosis lasting more than six months. Relator also discovered evidence reflecting double charging for the same patient, which was provided to the FBI.

39.    Relator and Ms. Payne furnished the FBI and Attorney General with enough information to begin a formal investigation that lasted approximately three years. The Washington State Medicaid Fraud Investigative Unit also gathered substantial information.

40.    After Relator blew the whistle on the Tribes' Medicaid activities, in 2011, Ms. Hamner wrote Relator up for disciplinary action, and at that time removed a fund of $85,000 that had been placed under his supervision for gambling and addiction programs. Ms. Hamner's action was ostensibly for missing work, on occasions that were all pre-approved by Ms. Hamner. She used the funds for her own agenda and Relator was placed on probation in retaliation for his whistle blowing actions. Additionally, several months after Relator's retirement

RELATOR'S COMPLAINT        Page 23

from Colville Behavioral Health Department at his doctor's recommendation due to deteriorating kidney function that was expected to lead quickly to his demise, Relator's health improved and he noticed there remained a vacancy in his former LMHC position at Colville. Relator applied for his old position, but was not even called for an interview. On information and belief, this also was retaliatory and not a reflection of his skills or expertise.

## THE ANTI-KICKBACK STATUTE

41.    The purpose of the Anti-Kickback Act, 42 USCS § 1320a-7b ("AKS") is to eliminate the practice of any person or entity from knowingly and willfully offering, paying, soliciting, making or accepting payment to induce or reward any person or entity for referring, recommending or arranging any good or items for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7(b)(b) and 1320a-7(b)(f).

42.    A "kickback" means any money, fee, commission, credit, gift, item of value or compensation of any kind which is provided directly or indirectly, for the purpose of obtaining favorable treatment with a contract. Under the AKS, it is illegal to (1) knowingly and willfully (2) offer or pay any remuneration (3) to induce such person to refer an individual to a person for the furnishing or arranging . . . of any item or service for which payment may be made in whole or in part

RELATOR'S COMPLAINT          Page 24

under a Federal health care program. *See* 42 U.S.C. § 1320a-7b(b)(2). In pertinent part, the AKS states:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

RELATOR'S COMPLAINT          Page 25

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

43.   In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. §1320a-7(a), civil monetary penalties of up to $50,000 per violation (42 U.S.C. §1320a-7a(a)(7), and three times the amount of remuneration paid, offered, solicited, or received, regardless of whether any part of the remuneration is for a lawful purpose. 42 U.S.C. §1320a-7a(a).

44.   In addition to the penalties provided for in this section or section 1128A [42 USCS § 1320a-7a], a claim that includes items or services resulting from a violation of these sections constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code [The False Claims Act, 31 USCS §§ 3721 et seq.]. With respect to violations of section 42 USCS § 1320a-7b(b), a person need not have actual knowledge of this section or specific intent to commit a violation of this section. 42 USCS § 1320a-7b.

45.   Pursuant to the scheme devised and implemented by Defendant and Oreiro, Defendant received, indirectly, cash remuneration for contracting with Oreiro and referring to Oreiro all of its Medicaid-eligible children for whom psychological counseling was sought. Defendant received excess remuneration

RELATOR'S COMPLAINT          Page 26

above that allowed by Medicaid by knowingly allowing and encouraging Oreiro to submit to Defendant false records upon which it knowingly based false claims for payment. Defendant also received indirectly cash remuneration for contracting with Oreiro and referring to Oreiro all of its Medicaid-eligible children for whom psychological counseling was sought by billing Medicaid, with Oreiro's knowledge and consent, at least twice the amount billed by Oreiro.

## FALSE CLAIMS ACT

46.    This action alleges violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3732, seeking damages and civil penalties on behalf of the United States and Relators as a result of the Defendant's knowing submission of false claims, making and/or using false statements or records, and conspiracy to commit these acts.

47.    The False Claims Act provides that any person who, *inter alia*, "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspires to commit a violation of subparagraph (A), (B) . . . is liable to the Government for a civil penalty of not less than" $5500 and not more than $11,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, P.L. 1041410) for each such violation, plus three (3) times the amount of damages

sustained by the Government because of the act of that person. 31 U.S.C. §§ 3729(a)(1)(A)-(C).

48.     The False Claims Act allows any person having knowledge of a violation of the False Claims Act to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730. Relator claims entitlement to a portion of any recovery obtained by the United States as *qui tam* Relator/Plaintiff is on information and belief, the first to file and an original source for the allegations in this action.

49.     Based on these provisions, Relators on behalf of the United States Government seek through this action to recover damages and civil penalties arising from the Defendant's submission of false claims and for payment or approval, its making and/or use of false statements or records material to false claims for payments, and its conspiracy to commit these acts. *Qui tam* Relator/Plaintiff believes the United States has suffered significant damages, likely exceeding $10,000,000.00 (USD), as a result of the Defendants' fraudulent conduct.

50.     As required under the False Claims Act, *qui tam* Relator has provided the offices of the Attorney General of the United States and the United States Attorney for the Eastern District of Washington a Disclosure Statement of material evidence and information related to this complaint. That Disclosure Statement,

RELATOR'S COMPLAINT          Page 28

supported by documentary evidence, supports the claims of wrongdoing alleged herein.

## CAUSES OF ACTION

### COUNT I
### False Claims (31 U.S.C. § 3729)

51.     Qui tam Relator/Plaintiff realleges and hereby incorporates by reference each and every allegation contained in preceding paragraphs numbered 1 through __ of this complaint.

52.     Based on the acts described above, Defendant:

a.     knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval;

b.     knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.     conspired to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval; and

d.     knowingly conspired to make, use, or cause to be made or used, knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

52.     The United States Government unaware of the falsity of these claims, records, and/or statements made by the Defendants and in reliance on the accuracy thereof, paid the Defendants for the fraudulent claims

RELATOR'S COMPLAINT          Page 29

**REQUEST FOR RELIEF**

53.   On behalf of the United States Government, the Relator seeks to recover monetary damages equal to three (3) times the damages suffered by the United States Government. In addition, the Relator/Plaintiff seeks to recover all available civil penalties on behalf of the United States Government in accordance with the False Claims Act.

54.   The *qui tam* Relators seeks, for his contribution to the government's investigation and recovery, to be awarded a fair and reasonable whistleblower award as provided by 31 U.S.C. § 3730(d) of the False Claims Act;

55.   The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including statutory attorneys' fees and expenses, as well as court costs from the Defendant.

56.   Relator further seeks pre-judgment interest at the highest rate allowed by law and post-judgment interest as applicable.

57.   WHEREFORE, Relator/Plaintiff prays that this District Court enter judgment on behalf of the Plaintiff and against the Defendant for the following:

a.     Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendant's conduct;

b.     Civil penalties against the Defendant equal to $11,000 for each violation of 31 U.S.C. 3729;

RELATOR'S COMPLAINT          Page 30

c.    That *qui tam* Relator/Plaintiff be awarded a fair and reasonable sum to which the Relator is entitled under 31 U.S.C. § 3730(d);

d.    That *qui tam* Relator/Plaintiff be awarded all costs and expenses of this litigation, including statutory attorneys' fees and expenses, as well as costs of court;

e.    Pre-judgment and post-judgment interest at the highest rate allowed by law; and

g.    All other relief on behalf of the Relator/Plaintiff and the United States to which they may be justly entitled, at law or in equity, which the District Court deems just and proper.

## REQUEST FOR JURY TRIAL

58.    Relator respectfully requests a trial by jury as accorded under Federal Rule of Civil Procedure 38 and the Seventh Amendment of the U. S. Constitution.

Dated: September 18, 2013

**UNITED STATES OF AMERICA, ex rel. GREGORY P. BUHLER**

Respectfully submitted:

**BOYD & ASSOCIATES**

 s/ Samuel L. Boyd
Samuel L. Boyd, P.C.
Catherine C. Jobe
6440 North Central Expressway,
Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com

RELATOR'S COMPLAINT          Page 31

1
2                    **VOLYN LAW FIRM PLLC**
3                    s/ Scott Volyn
4                    Scott Volyn
5                    WSBA No. 21829
6                    404 S Chelan Ave
7                    Wenatchee, WA 98801-2912
                      Telephone: (509) 665-6727
8                    Facsimile: (509) 665-0818
                      scott@volynlawfirm.com

RELATOR'S COMPLAINT     Page 32

1

2

## CERTIFICATE OF SERVICE AND DISCLOSURES

3

4    On September 13, 2013, Relator provided his Disclosure Statement to Ms. Pamela Derusha, U.S. Attorney for the Eastern District of Washington, Spokane

5    Washington.

6

7    On September 13, 2013, Relator provided his Disclosure Statement to Paul Wogaman, Department of Justice, Civil Fraud Division, Washington, DC.

8

9    On September 13, 2013, Relator served a copy of his Disclosure Statement upon the U.S. Attorney General, Eric Holder.

10

11   On September 17, 2013, Relator provided his proposed Complaint for filing under seal to Pamela Derusha, U.S. Attorney for the Eastern District of Washington,

12   Spokane, Washington.

13

14   On September 19, 2013, Relator served his file-marked Complaint filed under seal upon U.S. Attorney Pamela Derusha and pursuant to Rule 4 of the Fed. R. Civ. P.

15   via certified mail return receipt upon:

16

17   Mr. Eric Holder
     Attorney General of the United States
18   Department of Justice, Room B-103
19   950 Pennsylvania Ave., N.W.
     Washington, D.C. 20530-0001
20

21

22

23          _____/s/Scott Volyn_____
            Scott Volyn
24

25

26

27

28

RELATOR'S COMPLAINT          Page 1